Good morning, Your Honors. My name is Scott Collins, and may it please the Court, I represent the petitioners who are the 21 processors in this case. I'd like to reserve five minutes for rebuttal. You may, but try to keep track of it yourself. I'll do my best. When balancing the interests and the policies of the National Labor Relations Act, in this case with those of the federal maritime law, we brought the scale tips decisively in favor of applying the NLRA and its protective measures in this case. If the industrial factory involved in this case were on land, everyone would clearly agree that the NLRA applies to protect the concerted activities of the processors in this case. In fact, the NLRA and its policies were specifically designed to target and protect the practices that the crew members in this case took place. But, of course, we're not on land. Maybe just clearing that underbrush, you don't contend that for other purposes your clients are not seamen? No, we are not contending that they are not seamen. Yes, so for your purposes, they are seamen. For many purposes, they're just not. Well, the distinction I think you're driving at is that we say they're seamen, but they are not involved in the navigation function of the vessel, and that's a critical distinction that I'll come back to. The policies and interests that apply to food processors on land don't go away simply because these food processors were working on a ship, particularly whereas here we have a brief peaceful work stoppage involving employees who are not involved in the navigation function of the vessel and where they were seeking to bargain collectively. Those employees did nothing to interfere with the operation or navigation of the vessel. They did nothing to interfere with the work of the crew, and more importantly, they did nothing to cause imminent danger to the ship or the members of the crew. On your theory of the case, would you ask for, I think you're entitled to the same result, that we had a cruise ship and all of the cooks behaved as the way these processors did? That's not.  Right. That's not our case, but there's a certain level of logic. I'm asking you how you're wanting us to cast a principle. There's a certain logic that would apply to them, but I would draw a distinction, because here we're dealing with very industrial-oriented workers. We're dealing with a large group of workers that are involved in a processing plant that happens to be on a ship, whether bartenders. I mean, what's the legal basis for the distinction? I mean, you know, as an intuitive matter, I hear you, I understand it, but then I look at the legal construct and I can't fit it in there. So what's your legal basis for that? I wouldn't have a legal basis to draw a distinction between those workers, and I don't think there should be a legal distinction between those workers, but I think factually we're dealing with a different type of worker in this case. Well, obviously you're dealing with a different type of worker, but when I say you can't find a legal basis for drawing a distinction, I mean, that's what courts and laws are for. You know, if you can't have a legal basis for distinguishing between one type of worker and another, and what I would hope you would do is give us a way to define the group that you would exclude from the normal rule. You couldn't have a work stoppage among the people who operate the ship. Then Judge Fletcher asked you about cooks. Well, you know, that's not quite operating the ship, but it has to do with the passengers on the ship. It has to do with maybe the meals for the seamen on the ship. Now we're talking about a group that does something that has nothing to do with the function of the ship, and you'd have to give us some kind of a rule practically that we could adopt, and then you'd have to give us a basis for adopting that rule. And when you say you can't think of a legal basis for the rule, that's pretty difficult, other than a judicial system. I want to make sure I'm clear, and I may have misspoken. The distinction I can't draw is between a factory processor and someone aboard a cruise ship such as a hairdresser or someone who is not involved in the navigation function of the vessel. Well, there may be a difference between a hairdresser or someone who sells jewelry on the ship and a cook who provides essential meals for the passengers. That's right, and I would draw a distinction between a cook who is serving meals for the members of the crew who are involved in the navigation function of the vessel. I would not necessarily draw a distinction between cooks who are exclusively cooking for cruise ship passengers. So in your case, if you have cooks on the ship who are feeding the food processors, in your view, somehow you'd have to divide them between the cooks who are serving the crew that were navigating the ship? Now you've got yourself into a distinction that would make no common sense. And we're going to a distinction that I don't think we have to go to in this case. Well, it just comes down to you would like a different or new definition of seaman. For NLRA reasons, I'm trying to say that these seamen in this case, under these facts and under these circumstances, are entitled to protection of the NLRA. Yeah, but so far the only way you've distinguished them is at least you led off by saying they're not involved in the navigation of the ship. But you kind of backed away from that. What other possible distinctions? One that I can think of is that they sign an employment at will contract. That's another distinction, and I would say another distinction. But what consequence should we draw from that? I think from that the employer has made a choice that these individuals have the right to quit or the employer has the right to fire them mid-contract, mid-voyage, meaning that they are not viewed by the employer as essential to the navigation function of the vessel. And I think that's a big distinction. But we already have cases that make handymen and bartenders and dancers seaman, and this ship is a processing ship. I mean, that's the function of this ship. And you're talking about the definition of seaman for purposes of things like personal injury, Jones Act, perhaps wage statutes. We're talking about the NLRA labor statutes where we have an overlap between the protections of federal maritime law and the protections of the labor laws. And what I'm suggesting is that labor laws for purposes of this case ought to extend to these processors who, A, do not serve in a navigation function, B, they're at will employees. Another distinction I would make is really the circumstances. So if they had a contract and they weren't at will, a specific, you know, fixed contract, would that change whether they were seaman or not? That wouldn't change whether they're seaman. I think in my mind, especially applying Southern Steamship, it does bring it closer to Southern Steamship in terms of the fact that they are committed to continue working for the entire voyage. Here, they are not committed to continue working for the entire voyage. And if they're allowed to quit or the employer is allowed to fire them mid-contract, then that's different than saying this person is committed to working the entire time and the captain has complete authority over that individual. Can I just jump ahead? Sure. Obviously, the first question you raise is a threshold one on the seaman situation. But let's assume they're classified as seaman just for purposes of our discussion. One of the difficulties I have with your position is it seems like your use of the at will doctrine puts them in a position where they kind of want it both ways. I'm at will so I can quit at will. If I decide to quit because you asked me to go to work or do something at work and I don't want to do it, then, in fact, you've quit. And once you've quit, then, of course, you wouldn't be covered or, you know, you wouldn't have this situation anyway. But you want to say, well, I can quit when I want to quit, but if I don't like what you asked me to do and I quit, then I still have a remedy. So you seem to me to be kind of catching yourself coming and going on the at will doctrine. It's tricky, and I think we're getting bogged down on the decades-old body of law that covers seaman. And here we've got to look at it in a fresh light under the labor law. And I think the at will is important because, you know, if a crew member quits, obviously he's no longer an employee. The captain still has certain rights over the individual to order him when and where he can go aboard the vessel and what he can and cannot do, and we're not disputing that. But insofar as how the company views these individuals and how I think the law should view these individuals in terms of whether they should be protected by the labor laws, I think the at will concept is very important because it shows that the company itself doesn't view these people as critical to the navigation function of the vessel. Well, you know, you're back to your other question. I asked you to assume that it's a seaman. So under your view, could an at will employee ever be ordered to return to work? Not if he has been fired or he has quit. Right. But if I say, if the person says, look, I'm really mad about this and I don't like this and this and this, I'm not going to work today. And the captain says, you know, back to work. We've got fish flying, et cetera, et cetera. I'm not going back to work. Or he doesn't go back to work. Well, has he then quit? Yes, he has. Okay. But that's not what we have here. We have a group of 25 processors. So you're saying that you could be ordered back to work, but if you don't go back to work, you quit? No, I'm saying that once you quit, the captain doesn't have the authority to order him back to work. In fact, what the captain in this case thought was happening. But if you are an at-will employee and the person says, go to work, and you don't go to work, then you've quit. Then you've quit. And it happens frequently in the maritime industry. So up until the point you don't go back to work, if you are an at-will employee and the person tells you to do something, whether it's to go back to work or paint the deck or whatever, and you don't do it, that person is giving you a legitimate order that you're supposed to follow as an at-will employee, correct? Yes, except you just drawn a critical distinction when you said paint the deck. We're talking about factory workers, and you're asking the question. I'm understanding that you're asking me about factory workers only, not the navigation crew. Okay, so instead I said, you know, go back and start moving the fish through the line, and you don't do it, you've quit. The company has given him that contractual right to quit. Okay. But as long as he hasn't quit, then he has to obey the order, correct? That is correct. Okay. Wait, you're saying he has to obey the order if he's a factory worker? He has to obey the order of his supervisor if he's an employee, yes. He can't strike? He can't engage in a work stoppage? Now we're getting into a concerted effort, whereas before I was understanding the question to be a one-on-one situation. Here we're doing a concerted effort. So we stepped up the situation. Okay, we have stepped up the situation. Again, that's not exactly what we have here. But I would say in that situation, well, in this case, the captain asked these crew members to go back to work. The captain did that with the understanding that they had previously quit. So in his mind, he wasn't giving them an order, he was asking them to go back to work. But I would say the second step is, if we've got a concerted collective action, the captain's order still must be lawful. And if the captain cannot lawfully order a group that is striking to go back to work under the NLRA, in this case, and I'm talking about specifically our workers under our circumstances, then federal maritime law does not allow him to order that group to go back to work. Well, but then they've quit. So then it doesn't matter anyway. Well, they're on strike. No, they quit. You told me before. You were talking about one-on-one. Well, I'm talking now I'm moving it into the group. And that's precisely the difficulty, I think, with your argument is that, I mean, that if whether he gave an order or not, of course, is a factual issue that we look to the record and find if there's substantial evidence or not to support the board's finding. But you're basically saying, well, if they've quit, he can't order them back to work. Well, then if they've quit, then we don't have an issue, other than he needs to, you know, give them safe passage to, you know, to Skagway or wherever, Dutch Harbor or wherever they're going. And I may be not tracking your first question. I mean, to quit, you have to do something affirmative. You've got to make a decision to quit or renounce it. But if you are making a concerted strike and you say, we're not going back to work, we are not quitting, but we are not going back to work until you at least talk to us about this issue, that's not a quit. And that's what happened here. But then if you're, okay, so let's say I'm having a concerted work stoppage, but the captain says, back to work. I'm not, you know, I'm not going to brook this situation. Go back to work. That's a lawful order of the captain, is it not? I would say it's a violation of any law. I think it's a violation of the NLRA. Even if they have not quit, it's a violation? Unless they have not quit. And how is that a violation? Because it's precluding them from their right to collectively bargain and discuss work issues with their employer. But if that's what you're saying, it's irrelevant that this is an at-will contract because they've not exercised their rights under the at-will contract to quit. They've not quit. They're still under their employment contract. And you say, nonetheless, they have the right to engage in a collective work stoppage. And then we're back, I think, to the ground with which you began. They can engage in a work stoppage because they're not involved in the navigation of the ship. And I have to say, that one strikes me as a pretty adventuresome ground. Well, the at-will is significant in terms of how we look at these crew members and what their role is aboard a vessel. I don't think it's necessarily significant when it comes to a collective bargaining with the company. I think it's significant because they have the right to quit, which means in the company's mind, and I would say under a distinction in the law's mind, that they are not viewed by anyone as essential to the navigation of the vessel. And that's the distinction I'm trying to draw between this process. Yeah, but you see, I don't think that distinction exists in the law. There are lots of people on board a ship who do lots of functions unrelated to the navigation of the ship. And the way the law treats them is they are seamen subject to maritime law, period. That is right, for maritime law purposes. But here the question is, can we extend the NLRA to seamen at sea? And what you would be suggesting then is that seamen, regardless of what they do, regardless of whether they have anything to do with protecting the safety of the ship and the crew, that they will never, ever have the opportunity to benefit by the NLRA. And I don't think that's what we're looking at. Do you have any cases that go your way on this point? No, because there's never been a case that addresses factory processors aboard a vessel. But the opposite. You know, we have this odd situation where we have the maritime laws. Basically, you basically would have a hostage situation out on the ocean under your situation. Because you're out there, you don't have to obey the captain's orders, right, as long as it relates to your working conditions. You can just say, we're not doing it, right? That's right. And that would be the rule that you would like us to adopt? As long as it's done in a nonviolent way that doesn't jeopardize the safety of the crew and the ship. I think that's right. Okay. And the captain can do exactly what the captain did here, bring them in the shore and put them off the vessel. So the at will really doesn't have anything to do with it under your construct of the principle you'd like us to adopt. It does in the sense that when you're trying to view whether these crew members are viewed by the employer, by the crew member himself, and by the courts, as to whether they have a function for the navigation purpose. I think it's important there. But once we get to the collective bargaining issue, you're right. Okay. I like to save a minute for my rebuttal unless there's a question. We might give you a little more since we kept you busy the whole time. Okay. Thank you. Thank you. Good morning, and may it please the Court. My name is Jason Walta. I represent the National Labor Relations Board. I want to give five minutes of my time to counsel for the interveners, Ms. Loon. And I understand I'll keep track of that time myself. I'll go back to the question Ted McKeon asked at the end. Are you aware of any cases in which people who operated commercial businesses aboard a ship, such as barbers, beauty shop operators, jewelry salesmen, cruise ship, on which they were treated as seamen for purposes of labor relations? Well, Your Honor, I don't have anything as up-to-date as that. I think to find the authority that speaks to this issue, you've got to go back. You've got to go back quite a ways, about 150 years. Before there was an NLRA. Before there was an NLRA, but I can explain to you why the passage of the NLRA. Well, nobody had any rights until then. No, no. The counsel trying to exclude, not say that everybody on the ship isn't a seaman for purposes of Jones Act, but whether for purposes of the NLRA, people who operate purely commercial ventures aboard a ship are treated for the purpose of the NLRA. They're excluded because this commercial operation is on a ship. Well, Your Honor, I think the reading of Southern Steamship is that if you are covered by the duty of obedience, codified. I guess the answer to that question must be no. Yeah, the answer to your question is no. I'm sorry if I wasn't more frank. I don't have a case that exists. It deals with commercial operations aboard a ship. Your Honor, I don't. But I don't think that the absence of such a case means that you should infer that there's a different rule from all of the other case law. No, no. I didn't infer there's a different rule. I want to know whether there was a rule one way or the other. But it is important to understand the operation of the maritime statutes where we're talking about functions that don't deal with the navigation of the ship. And the rule is a longstanding one. I cited a case going back 150 years, the boarding case. I cited that case in my brief. And this was a whaling ship. And the captain of the ship had instructed the seaman to go about the business of whaling, not something that involved the navigation of the ship, something that was strictly related to the commercial purpose of the ship. And the seaman refused. And the court held that the refusal of that, that it was a lawful order to continue the business of whaling and the refusal to engage in whaling was defiance of the captain's order sufficient to constitute mutiny. And it's against that background which the court in Southern Steamship was very clear was not altered by the passage of the NLRA that we have to understand this case. And I will admit that this case has some very unappetizing facts. It has bad facts. But I don't think it should be taken as an invitation to make bad law. Mr. Palmer did a valiant job up here, but he had a lot of difficulty articulating stable distinctions that would be able to hold up in this context. And I think the reason that he wasn't able to do that is that there aren't distinctions that can hold up in this context. Although it's tempting to look at this contract of employment, which is a distinct contract of employment from the ordinary seaman. The ordinary seaman signs a contract that says, I will serve out until the end of the voyage unless fired for cause or some such thing. The ordinary seaman does not serve in an at-will contract under which the ordinary seaman can say, you know, two days out of Yokohama, say, I'm quitting and I got my own peanut butter sandwiches. You don't have to pay any attention to me. I quit. That's not an ordinary seaman contract. This, however, is an at-will contract. These guys do have the right to quit any time they want to. So what are we to make of that? Well, Your Honor, I think that, and I think that Judge McEwen noted that it is a little bit counterintuitive to say that the at-will statute gives you protection against discharge, greater protection. Is there an at-will statute? Or is there an at-will statute? No, no, I'm sorry. The at-will status, I'm sorry. At-will status gives you greater protection against discharge and greater license to defy the captain's orders. But as far as the at-will distinction as the for-cause distinction, part of that is just a function of the kind of voyage. In coast-wise voyages and inter-coastal voyages, all the seamen on the ship are article seamen and they have this obligation to continue throughout the voyage. Now, that applies to cooks and other people aboard those ships who don't have anything to do with the navigation of the vessel. Fishing voyages, there's no statutory requirement for at-will status. So the navigational crew here could have had, I don't know if we know anything about the fishing contracts of the navigational crew, but the navigational crew could have had at-will contracts. And I don't think that the processors are suggesting that they could defy the captain's orders. So it can't turn just on the at-will nature of the contract. If they had an at-will contract, they could defy the captain's orders by saying, I quit. I say if. I doubt they did. That would be a very unusual contract for somebody who's actually engaged in the navigation of the vessel. But that's not what happened here. There wasn't a quit. They're asserting the right, and had they quit, this would be a different case. They're asserting the right to remain as employees and not be fired, but refuse to work, contrary to the agreement in their contracts that they would obey the master's orders. Let me just stop there. If you interpreted that they quit, then we wouldn't have a case at all to talk about, right? Correct. Correct. One option is to say you construe all this and they quit. The other one is to say, well, they didn't actually quit. They just refused to follow the order. I mean, that's the situation we're in trying to figure out what's the legal outcome of that situation. And I want to put just a little bit of nuance on that. If there were voluntary quits, the board does have a constructive discharge doctrine where a seemingly voluntary quit might be treated as a discharge in any event. But the board's finding here is that they were discharged. It's the processor's contention here that they were discharged. And although the company resisted it for a time, they're in agreement now that they discharged the processors. So we're not in the world where they simply quit pursuant to their at-will contracts. They wanted to remain as employees, defy the captain's orders to go back to work. Their discharge for attempting to engage in what would normally be the mildest form of collective action, seeking to discuss an order that they worked maybe could have been 20 hours a week a day, but instead it was 16-and-a-half hours a day. They wanted to discuss that with the captain, which anywhere would have been the mildest form of collective action. And, Your Honor, I — That's why they were discharged. That's exactly right. And I don't want to defend the onerous working conditions that they were working under. And I would say that if this were a land-bound workplace, you would have almost the platonic ideal of Section 7 activity going on here. But, as we know from Southern Steamship, the American setting makes all the difference. If they told them to work 20 hours, would that be the same case? Well, Your Honor, they were already asked to work 16 hours. So I don't know how much — and that is extremely onerous. And I don't know how much closer we get to the line of being too onerous just by adding a few hours. 16 hours was pretty onerous on its own. I don't know if we get very far by adding a few hours from there. But I have to say that under Southern Steamship, the result would be the same. That's if you can't treat anybody on the vessel differently than the person on whom the operation of the ship is dependent. Now, that would just be a question of a rule, where you want to draw the line. Would this be true of somebody who operated a jewelry store on the ship? Well, Your Honor, if that person was found to be bound by the duties under the maritime laws to obey the captain's orders, then, yes, by a — Somebody ran a jewelry store, and the captain said, I want you to run it 24 hours a day if you want to take a couple of naps, okay? And so that person could be fired, and there'd be no problem with that? If they got together with the other people in the store and said, look, we want to have decent hours to run this store, the captain said, I want you all there 24 hours a day? Well, Your Honor, I don't want to say there would be no problem with it, but that the NLRA wouldn't be able to step in and fix that situation. But I want to emphasize that the NLRA — it's not the case that the NLRA has no application here, as the processors suggested. In fact, where Southern Seamship didn't stand as an obstacle to the company's unlawful conduct — to privileging otherwise unlawful conduct, the board did what it could to remedy the situation. They found two discharges unlawful, and they found an interrogation of one of the processors unlawful, and they ordered the board's usual remedies for those violations. They ordered a cease-and-desist order for those violations, and they ordered reinstatement and back pay for the two individuals who were unlawfully — Let me ask you this. So far, much of the questioning and the responses have been premised upon the captain having given lawful orders to these processors to return to work. Yes, Your Honor. That's not what the ALJ did in characterizing what the captain said. Now, the board says it was an order, but I have trouble seeing that it was an order when the captain himself says he was not ordering them because he thought they'd quit and he had no authority to order. Why are you assuming that this was a lawful order from the captain rather than a request from the captain when the captain himself is unwilling to characterize what he said as an order? Well, Your Honor, there was a bit of kind of coy game-playing going on on both sides here. The company wanted to say that the employees had voluntarily quit. Processors were trying to say that they were never ordered to return to work. The board's job here was to cut through the parties' contentions. But the captain himself says, I didn't — I had no authority to order them to work, and I didn't do so. I want to point you to the points in the — to parts of the record that provide substantial evidence for the board's conclusion that this was an adequate order to — for them to understand it. And all of these sites are in my — the board's supplemental excerpts of record. Page 38. This is the captain speaking. I told them to go back to work, and we will talk about it later. Page 41. I said, look, we will talk about this. Go back to work. We will talk about this later. Page 53. We begged, pleaded, asked them, ordered them to go back to work during the whole thing. And this is — and I won't belabor this too much. This will be the last quote. Question. Once the entire group had reassembled in the library, did you once again tell the group to go back to work? I did. Did you put any condition on that at that time? No, I did not. What page is that? I'm sorry. That last one is page 53. Yeah, the captain says, also, I believe I had no authority to do so because I thought they'd quit. Well, at some point he did. He considered them to have quit. He says that so he can say, I told them to go back to work, but at the same time he's saying I had no authority to do so. I didn't think I could. Well, Your Honor, I think right in context what he was talking about was later, after they had repeatedly told him that they weren't going back to work, that he had assumed that they'd quit, that he had treated them as quits, and that instead of continuing to try to entice them, that he was going to treat them no longer as employees, put them ashore at the next stop. I'm not sure it makes much difference whether or not he was ordering them or not. The question really is whether they have the right to engage in an organized work stoppage, not having yet quit. Well, Your Honor, I think that does get more to the point here, and I want to talk about Southern Steamship, what they say is necessary to qualify as an act of mutiny that would forfeit the protections of the act. And all that's necessary is to resist the captain and other officers and the free and lawful exercise of their authority and command, and to undertake to impose their will upon the captain and the officers. And there's really no question that's what occurred here. And in a land-bound workplace, that would be a perfectly appropriate act of economic warfare. But we know from Southern Steamship that those kinds of acts of economic warfare, what's usually the kind of basis of the NLR scheme, NLR scheme, to go to the group where they thought they had been asked to come to talk to the, whatever the man was in charge of them. They understood they were supposed to come talk to him, and he would discuss this in peace and hours. And they went to the room peacefully to meet with him. And they sat there. That wasn't warfare. Oh, that certainly was not, Your Honor. And that wasn't the conduct that triggered what we're calling the mutinous action here. So then if Judge Fletcher were right and they hadn't ordered him to do anything, they just said go back to work. They told him to go but didn't give him an order. There wouldn't be anything wrong with him saying, no, we want to talk to this man who said he would talk to us. Well, up to the point before they told him to go back to work, there was nothing wrong with that. There was nothing that offended the mutiny statutes. And if you burn an order, it wouldn't come under Southern Steamship. Well, but the board found that there was. You had the board decision after that where they said, well, it wasn't an order. The board found there was an order in the repeated calls to go back to work. And I read you some of the testimony. Well, there's only one word in there that makes me think it could have been an order. Most of the other time when if they thought they had quit, if the captain thought they had quit and he said you should go back to work, that doesn't mean you're ordering somebody who has quit. It means you're asking somebody who's quit but hasn't left the ship. Well, in that case, Your Honor, the entire violation breaks down. If it was simply presenting them with an uncoerced choice to do one thing or the other, Section 881 only bars coercion. And if they were simply presenting them with this uncoerced course, the entire violation breaks down. I see that I'm cutting my intervener's time, and I don't want to. We'll give you five minutes. You'll give me five minutes to continue talking or to get up? To rebut it. Okay, thank you, Your Honor. No, you don't get rebut. He doesn't get rebut. Oh, I'm sorry. We'll give your co-counsel five minutes. Okay. I'd just like to answer this. Okay, I'm sorry, Your Honor. If they hadn't quit but the captain thought they had and he said go back to work or I'd like you to go back to work or go back to work, that's not giving them an order. That's telling them because if he thought they had quit, he couldn't give them an order. But he could tell them, you know, go back to work. You should go back to work. And I'd like you to go back. You can say all of that if you didn't give them an order. And then later if they didn't do that and they were fired because they hadn't actually quit, that would be the problem. Well, Your Honor, I think only if we take the processor's narrow definition of what constitutes an order, which is the word order passing the captain's lips. But here we have the captain clearly saying go back to work. Your continued employment depends on it. And that is sufficiently that gives them sufficient notice of the captain's intentions. And actually as a matter of maritime law, I'm not sure it's 100% accurate that even if they had terminated their employment, they weren't bound to follow the captain's orders. At least Benedict on Admiralty says that all are bound to obedience regardless of position and continue to be bound even if employment is terminated mid-voyage. So I don't know if they, following their termination of their employment, they're completely free to do so. Well, but Benedict there is talking about something else. It does say, of course, anyone on board ship is bound to follow certain orders of the captain. But go back to work is not one of them if they quit. That may be so, Your Honor. But here you have the employees insisting that they were still, that they hadn't quit, and the captain saying, well, then go back to work or you'll be treated as quit. And if you don't go back to work, you're going to be fired or suffer penalties. I think that that is sufficiently direct. And really the only context that's analogous here is perhaps the military one. I don't think that if we were in a military context, if a captain in the Army or on the captain of a naval ship was telling the seaman to go back to work, that that would be something that they could disregard because the word order wasn't attached to it. I don't want to pursue this too far, but a naval vessel does not operate under the same conditions. And I have yet to see any military contract that is at will in which the soldier or the sailor can say, I quit, I'm gone now. There are a lot of people who like that. But, Your Honor, there's no reason why those military contracts don't say that. That's certainly true, Your Honor. Some cases make the distinction or make the analogy, but I agree that it's not a perfect one. But it's also true that these contracts didn't have to be at will. They could have employed them for the term. Their duties would have been exactly the same. I don't need to pursue them in the military analogy. Okay. Well, thank you for the additional time, and we just ask that you deny the petition. Thank you. May it please the Court, good morning. My name is Gail Loon. I represent Phoenix Processor Limited Partnership, the employer in this case. Because the Board properly weighed the competing interests of the NLRA and the existing military – military, sorry, Your Honor. Judge Fletcher had me with a word in my head. The shipping code and longstanding general maritime law, the Board's decision should be affirmed in this case. What I think is at issue here, and let me just speak for a moment on the at-will contract, all fish processing employees, all deckhands, all captains, all relief captains, all engineers, all cooks have in the fishing industry at-will contracts, at least within my client base, they do. Is that in the record? I believe we did mention that in the record. I don't remember if it was in the record below or in this Court's excerpts of record. But it does exist in our briefing to the ALJ. I believe – So you're representing to me that everyone involved in the navigation of the ship, they're 100 miles offshore in the middle of the storm, can say, I quit? The law says they can if you have an at-will contract, Judge, and that's exactly what's the case here. The important thing to keep in mind here, especially with respect to the processors' at-will contracts, is that within the fishing industry it is a very difficult employment. It is a very difficult, cold, long work hours. And, Judge Reinhart, you indicated that what happens if it goes 24 hours instead of 16-and-a-half hours? There is a case on point, and I'll do my best to find it before the end of our argument today. It's an old case. But basically when somebody signs on to be a fish processor, they don't always know exactly what they're getting into. By confining them to a set period of time, either voyage to voyage or for a set month or a set season, those people wind up with an unfortunate set of circumstances where they find that they're just not suited to factory processing work or they're not capable of performing that work. The at-will contracts allow them to ease out, if you will, on an individualized basis and or for the company to ease them out on an individualized basis. That's the reason, primary reason for the at-will contracts. As to navigational crew, a captain could in fact say, I quit. There are relief captains on board. There are always means for them to be covered because we're always anticipating the eventuality, the unfortunate eventuality, where the captain could become disabled or could become incapable of working. So there are redundancies, as with any maritime adventure. Generally speaking, there's at least two levels of redundancy in staffing. Well, let me ask you, when I use the hypothetical of the 24 hours with the jewelry store people, but on this ship, you went to 16 and a half. I said, what if they've gone to 20? You say there's a case of assistance. There's an older reported case, Your Honor, and I ran across it yesterday in my preparations for oral argument and for whatever reason didn't make a handwritten note to myself, but I will do my best to find it. It is an older case, and it was a captain who operated a barge. It was on what was called the Ashland Run, so you could just probably, Westlaw, Ashland Run. The captain had made the run several different times, but it would take anywhere from 24 to 30 hours to make the run. The captain was required to stay on board the vessel on the trip to the refinery and then to stay on board while the vessel was taking on the petroleum products and then take the vessel back to the other end. At one point, he had asked his employer, the owner of the vessel, whether he could have a relief captain meet him there so he could sleep in between, and the employer said no. The next time that he was asked to make the Ashland Run, the gentleman said, no, I won't, and he was terminated. And the court said, and I'm trying to remember if it was the Fourth Circuit Court of Appeals or whether it was the U.S. Supreme Court if it made it that far, that that was basically refusing to follow the order of the master to make those runs. Now, today we have licensing requirements that would probably make that improper to do because the watches are regulated in terms of time, but back then that was considered disobedience sufficient to justify discharge of the seaman. And that's ultimately the word that we're looking for. It's not so much mutiny, it's not so much willful refusal to follow a lawful order so much as the shipping code, 46 U.S.C., Section 115.01, requires all seamen to give their obedience to the master of the vessel. Our crew contract also requires that. And the reason for that is really very simple. You ask about somebody who quits. Well, they get to stay out of everybody's way in their quarters or in general areas of the boat, but they are then put ashore, and under Alaska's anti-stranding statutes, they're returned to their point of hire by the owner of the vessel, but they are then replaced. But no special efforts are made to remove them from the vessel because why? We're in the middle of the ocean. If there's a fire, we don't call the fire department. We put out the fire ourselves. And you have to put them on bread and water, too. A thousand calories a day, Your Honor. That's for mutiny. That's not when they quit or not when they're discharged. Disobedience, as I recall, that statute. Repeated willful disobedience. There are two separate statutes here, Your Honor, subsections to that statute. One is just simple disobedience to the orders of the captain. And before I get too far along and before I run out of time, let me just speak to Mr. Collins' argument that somehow there's a distinction between navigational employees and factory processors. My French is horrible, so please forgive me. But the factory operations are the raison d'etre. I mean, they are the reason why that ship is in the ocean in the first instance. So to claim that there's no connection between the mission of the vessel and the people who make that mission possible is a distinction without a difference. Moreover, the case that was cited in their reply brief, and this was, by the way, a new argument in rebuttal in the reply brief. It hasn't been raised prior to this time. Bassett, it basically says that in that case it was the court was trying to decide whether or not an individual who had died on the job by falling off the boat or off the ship was a seaman or a longshoreman, such that under one set of circumstances the vessel owner would be required to pay for the damages and under the other not. They made no distinction between crew and seaman, such that Mr. Collins is attempting to imply. By saying the navigational crew is crew and that the factory processors are just that. They're not seaman. The reason why obedience to the captain's orders, and I struggled with whether to bring this up or not, I captained an 83-foot steel-hulled 140-ton vessel. I live on board my boat, and I captain my boat, and I deckhand my boat, and I'm also the galley slave. But basically you can fire yourself. I could fire myself. I follow my own orders really well. But not only does my partner, when he is not the captain, responsible for following my orders, whether I couch them in terms of an order or not, but there is a speech that we give all guests, all passengers at the beginning of every voyage, that it is for the safety of everyone on board, all souls on board, that there be discipline and good order when this vessel is in the middle of the water. You know, when we're at shore, you go ashore and do what you want. But if we ask you to do something or tell you to do something, there's an expectation that it be done. There's also such a concept as standing orders in this context, getting back to the case at Barr. Standing orders are you have a shift to work. The reason we're here is to cut fish, process fish, you know, to go back and sell fish so that everybody can make money. It's a very compact season because of the quota system. And many of these individuals worked just that season, and that was their earnings for the year. So consequently, you have orders that are standing orders, and that's that you show up for your shift and you do your job. And when you show up and say, I'm not going to do my job, and you're at the head of that processing line, that affects everybody else behind you. But from the captain's standpoint, I shouldn't have to, and no captain should be required to, at sea, negotiate with anybody to make sure that the boat runs in good order. We're not suggesting that the NLRA has no applicability to seamen. Quite the contrary. We're asking, as this court did in Mount Vernon Tanker, carve out the narrowest of narrow exceptions, and that's to say that when a vessel is in navigation, seamen don't engage in work stoppages, in disobedience to the standing orders of the captain or the express request or order of the captain. And that very, very, very narrow exception does not prevent them from organizing, does not prevent them from forming a union or joining an existing union, and there are a number of maritime unions, seafarers unions throughout the country. It does not stop them from seeking redress for discrimination. It does not stop them from seeking redress for other things like improper interrogation. What about, was there a State law case filed here? Yes, there was. And has that come to completion? All of the pending claims have been completed, some by summary judgment, some by settlement. There was ultimately the one, the last, Mr. Collins can correct me if I get this wrong, my partner Dave Rotz handled most of that litigation. The last remaining issue was under the fishing contract issue of wages, 11601, and that was ultimately resolved by settlement. Breach of contract and other issues were resolved on summary judgment and upheld on appeal. Thank you. So thank you very much, Your Honors. I would ask that you affirm the Board's decision, which does in fact create just a very, very narrow exception to application and access to NLRA protections for seamen who are actually in operation at sea. Thank you. Yes. I would like to end in rebuttal with two thoughts. We'll give you a few more minutes. I'll be as brief as I can. The Board and the employer give Southern Steamship too broad of a reading. Southern Steamship says that maritime law trumps labor relations law when the conduct of the crew in collectively acting jeopardizes the safety or well-being of the vessel and the crew. We don't have that here. No one was jeopardized. This ship was never jeopardized. We don't have anything close to the Southern Steamship case. The second thought I want to end on is on this vessel we had over 100 processors. This is not the only vessel flying the waters of Alaska. We have many processor and catcher processor and factory trawler vessels. As counsel for the Board said, the facts of this case are about as good as they get for an NLRA protection action. If this court were to deny protection to the processors in this case, this court, I think, would essentially be eviscerating application of the NLRA to all at-sea processors who are doing very similar, if not identical work, to counterparts on land. That is, they are processing food. They are not manning the lines. They are not doing anything with the navigation function of the vessel. And if the processors in this case cannot get relief under the NLRA, I don't think there's a single seaman out there, regardless of what his or her position will be, will gain relief under the NLRA in a situation where multiple crew members simply go and want to talk to a factory manager about an extra half hour that he's added to an already very long day. For that reason, I would say I would ask this court to please reverse the NLRB. I wasn't helpful in drawing a distinction as to where and when and what seamen should be protected, but I don't think we need to draw a bright-line distinction. I think in this case where we have pure factory processors who did not challenge the captain's authority, they did not storm the wheelhouse with knives in their teeth, they simply went with a good-faith belief to sit down and talk about the extra half hour a day on a 16-hour schedule. These men are entitled to the relief afforded to them by the NLRA. Thank you. Thank you, counsel. Thank you, all of you, very much. The case discharge will be submitted. The court will stand in recess.
judges: Reinhardt, McKeown, Fletcher